ORIGINAL

IN THE UNITED STATES COURT
OF FEDERAL CLAIMS

FILED
NOV 1 2007
U.S. COURT OF FEDERAL CLAIMS

**Precision Lift, Inc.** )
)
**Plaintiff** )
)
**v.** ) **No.** 07-762 C
)
**The United States** )
)
**Defendant** )

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER AND APPLICATION FOR A PRELIMINARY INJUNCTION**

## I. INTRODUCTION

The instant action is brought by Plaintiff, Precision Lift, Inc. ("PLI" or "Plaintiff") under the Court's "bid protest" jurisdiction. See 28 U.S.C. § 1491(b). The matter is currently before the Court on PLI's Motions for a Temporary Restraining Order and Preliminary Injunction.

Essentially, PLI is challenging the decision by the Small Business Administration ("SBA") Area Office determining that PLI is ineligible for award of contract under Solicitation W58RGZ-07-R-0260 ("the Solicitation"). PLI has appealed that determination to the SBA Office of Hearings and Appeals ("OHA"), and PLI seeks a declaratory and injunctive relief, on the basis that the decision by SBA Area Office that PLI is ineligible is arbitrary and capricious and lacking a rational basis; however, if the Agency awards the contract arising from the Solicitation prior to a decision by the OHA, PLI's appeal will be dismissed by the OHA as moot, thereby denying PLI the opportunity to overturn the Area Office's Size Determination and receive the contract award.

## II. STATEMENT OF FACTS[1]

PLI has been in operation since May of 1990; it was originally incorporated in the State of Virginia, the Virginia Corporation was dissolved and PLI was then incorporated in the State of Montana in 1999. Since October, 2005 John Tollenaere, PLI's President, been the sole stockholder in PLI, and through him PLI has been certified by SBA as a Viet Nam Era Service Disabled Veteran-Owned Small Business ("SDVBO"); PLI is also a SBA certified HUBZone Small Business Concern.

In 2001 PLI began working with a Canadian company, West Coast Weld Tech, Inc. ("WCWTI"), which was a manufacturer of helicopter maintenance platforms. In 1998, PLI had been awarded a General Service Administration ("GSA") Federal Supply Schedule ("FSS") contract for Heli-Baskets, i.e., Contract No GS-07F-9893H; in 2001, as a result of PLI's new relationship with WCWTI, helicopter maintenance platforms were added to PLI's GSA FSS contract. Because GSA contracts contain a NAFTA clause (FAR 52.225-21 or 52.225-21), the contractor is permitted to supply Canadian manufactured products, as if they were domestic.

Subsequently, PLI and WCWTI discussed the establishment of an American manufacturing facility, so as to be able to compete for maintenance platform contracts outside of PLI's FSS contract (i.e., contracts without the NAFTA clause). As a result, in 2005 WCWTI established West Coast Weld Tech International ("WCWT Int'l") at 4101 North Star Blvd., Great Falls Montana.

---

[1] The facts set forth herein are taken from the Declaration of PLI's President, John Tollenaere, submitted herewith.

In November of 2006, PLI became aware of a procurement being conducted by U.S. Army Aviation and Missile Command ("AMCOM"); the procurement, a small business set-aside, contemplated a FIVE (5) YEAR Indefinite Delivery-Indefinite Quality ("IDIQ") contract for maintenance platforms for various helicopters. The FedBizOps announcement established a size standard of 1,000 employees and cautioned that participation in the procurement was limited to "U.S. Small Businesses;" under the NAICS code/size standard (i.e., 1,000 employees), PLI qualifies as a small business.

Solicitation W58RGZ-07-R-0266 ("the Solicitation") was then issued by AMCOM on January 25, 2007. The Solicitation included the clause at FAR 52.219-6, Notice of Total Small Business Set-Aside; that clause requires that if the offeror is not the manufacturer of the items being purchased by the Government, the offeror agrees to supply only items produced by a small business located in the U.S. PLI submitted its offer in response to the Solicitation by letter dated February 28, 2007.

By letter dated March 15, 2007 the AMCOM contracting officer advised PLI that its proposal had been found to be "technically unacceptable" for various reasons. By letter dated March 23, 2007, I responded to AMCOM's March 15 letter, providing the requested information. PLI's letter responded to a question in AMCOM's letter and indicated PLI intended to subcontract the manufacture of the platforms to "West Coast Weld Tech;" it did not differentiate between West Coast Weld Tech, Inc. and West Coast Weld Tech International, Inc., but PLI's intent was for the manufacturing operation to be conducted at the WCWCT Int'l facility in Montana. That intent was confirmed in PLI's letter of April 19, 2007 to WCWTI in response to the April 18, 2007 WCWTI Annual Report; the letter expressed PLI's

understanding that any maintenance platforms manufactured by WCWTI for PLI would be manufactured in Montana.

By letter dated May 1, 2007, AMCOM informed PLI that its proposal was now considered "technically acceptable;" PLI was also asked to confirm that its platforms would be manufactured in the United States, since according to the AMCOM letter PLI "is teaming with West Coast Weld (sic) which is a Canadian Company." By letter dated May 4, 2007, PLI responded to AMCOM's May 1 letter and verified that all end-products it would supply under a contract arising from the Solicitation would be "manufactured domestically." At PLI's request, WCWTI later confirmed that all manufacturing operations would be performed at its WCWT Int'l facility in Montana; it also provided a report on the status of the Montana facility to perform the necessary manufacturing operations.

In late July/early August, a DCMA Team visited the WCWT Int'l facility to perform a Pre-Award Survey in order to verify that the platforms required under a contract arising from the Solicitation could be manufactured at the WCWT Int'l facility; as part of that review, PLI provided a three-ring binder of documentation on itself and a WCWTI binder, outlining the company history and its plan for all the manufacturing operations required to produce the maintenance platforms to be conducted in its U.S. facility. PLI has not seen a copy of the Pre-Award Survey, but we understand that the DCMA team verified that the contract, if awarded to PLI, could be performed at the WCWT, Int'l facility in Montana.

By letter dated September 11, 2007, PLI was informed by AMCOM that it was ineligible for a contract award due, according to AMCOM, to a decision by SBA concerning WCWTI (i.e., that the platforms would be manufactured in Canada). PLI

had become aware during the Summer of a size challenge against the apparent winner, Fernandez Enterprises, LLC ("Fernandez"); that challenge resulted in a decision by SBA that the Fernandez proposal contemplated manufacturing of the platforms at WCWTI's Canadian facility and thus it was ineligible for award under the 52.219-6 clause; that decision was later affirmed by the SBA office of Hearings and Appeals ("OHA"). While PLI had heard that there had been a size challenge against the Fernandez offer, PLI did not receive notice from SBA of the challenge and did not participate in proceedings thereon.

In response to AMCOM's September 11 letter, PLI's counsel filed an Agency Protest contending that the issue of whether PLI's proposal was eligible for award was exclusively committed to SBA and that the OHA decision did not rule that the Montana facility was not <u>a</u> manufacturer; rather it ruled that it was not <u>the</u> manufacturer identified in the Fernandez proposal, which clearly showed Fernandez's intent to manufacture the platforms in Canada; the Agency Protest went on to explain that PLI's proposal, as confirmed by the DFAS Pre-Award Survey team, contemplated manufacture of the platforms in Montana and that the platforms could, in fact be manufactured in Montana. PLI believes that AMCOM then notified unsuccessful offerors that PLI was the proposed awardee; that apparently prompted the instant size protest by Spika Welding and Manufacturing, Inc. ("Spika"), apparently another offeror on the AMCOM procurement. Spika's protest, for the most part, parroted the OHA decision; however that decision, as is noted above, is based on a review of the proposal submitted by Fernandez showing that its platforms would be manufactured in Canada.

PLI responded to the Spika Protest by providing SBA with a Declaration Under Penalty Of Perjury signed by Mr. Tollenaere, in which he reiterated PLI's commitment to produce the platform at the Montana facility. On October 18 at about 1:50 P.M., PLI received an e-mail from SBA requesting certain additional information; the e-mail requested the information by close of business that day. PLI responded by October 19, providing the information requested and answering the questions in the previous day's e-mails.

On October 24, 2007 the SBA Atlanta Area Office ruled that PLI was ineligible for the award under the Solicitation, because in sum and substance, PLI could not show that manufacturing of platforms was actually taking place at the Montana facility on the date of PLI's Final Offer to AMCOM, and according to the decision, there was a "risk" that the platforms required under a contract resulting from the Solicitation "could" be manufactured in Canada. PLI has appealed the Area Office decision to the SBA Office of Hearings and Appeals ("OHA"), challenging the decision by the Atlanta Area Office. The OHA, however, has a policy that where, as here, the size determination was contract specific (i.e., only applicable to the particular procurement), if the contract is awarded, the Size Appeal will be dismissed as moot, meaning PLI will be denied the opportunity to overturn the Size Determination and receive the contract award.

## III. LEGAL ANALYSIS

### A. General Principles

In order to obtain a temporary restraining order, the plaintiff must show: (i) it will suffer irreparable injury unless the order issues; (ii) the threatened injury to the

moving party outweighs any damage to the opposing party (iii) the temporary restraining order, if issued, will not be adverse to the public interest; and (iv) a substantial likelihood exists that the moving party will prevail on the merits. See, e.g., OAO Corp. v. United States, 49 Fed. Cl. 478, 480 (2001). A temporary restraining order is an "extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (citing 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948 129-30 (2d ed. 1995)); see also Minor Metals, Inc. v. United States, 38 Fed. Cl. 379, 381 (1997) (citing Golden Eagle Refining Co. v. United States, 4 Cl. Ct. 622, 624 (1984)).

**B. Irreparable Injury.**

When assessing irreparable injury, "[t]he relevant inquiry in weighing this factor is whether plaintiff has an adequate remedy in the absence of an injunction." Magellan Corp. v. United States, 27 Fed.Cl. 446, 447 (1993); see also PGBA, LLC v. United States, 57 Fed. Cl. 655, 664 (2003). PLI asserts that it will suffer irreparable harm if the temporary restraining order is not granted, since award of a contract will render PLI's Size Appeal moot,[2] and the only other available relief – primarily, the potential for recovery of bid preparation costs – would not compensate PLI for its loss of valuable business. The latter form of potential economic loss has been found sufficient to prove irreparable harm, see Norfolk Dredging Co., v. United States, 2003 WL 221416757 at 17 (Fed. Cl. 2003); United Int'l Investigative Servs., Inc. v.

2 See, e.g., Size Appeal of Food Engineering Laboratories, Inc., SBA No. SIZ-2003-08-07-46 at 2 (2003); Size Appeal Of Hanel Storage Systems, L.P., SBA No SIZ-98-10-26-45 at 2 (1998).

United States, 41 Fed. Cl. 312, 323 (1998), Bean Dredging Corp. v. United States, 22 Cl. Ct. 524 (1991).

**C. The Public Interest.**

Plaintiff needs no extensive argument as to the public interest. It was the lowest-priced offeror remaining in the competition for the helicopter maintenance platforms, items which PLI has successfully produced in the recent past.

**D. Lack of Harm to Other Parties.**

Under the terms of the Solicitation, deliveries under the contract as not required until 140 days after the AMCOM's initial order (and then only 4 maintenance platforms are due in the initial order). Thus a brief delay while the Court considers PLI's Complaint will have little effect on the AMCOM.

**E. Plaintiff Has Shown A Strong Likelihood Of Success On The Merits.**

The Court reviews challenges to agency actions described in § 1491(b)(1) according to the standards set forth in the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA"). 28 U.S.C. 1491(b)(4). Under the APA, the reviewing court may only overturn an agency action if the court finds that it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2000). Cardinal Maintenance Service, Inc. v. United States, 63 Fed. Cl. 98,105 (2004). The Supreme Court has identified four grounds that constitute arbitrary and capricious agency action:

> Normally, an agency [action] would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an import-

> ant aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983); Spherix, Inc. v. United States, 62 Fed. Cl. 497,504 (2004).

PLI respectfully submits that the SBA Area Office determination contains several factual errors and erroneous conclusions. For example, on page 3 of the Size Determination Memorandum see Exhibit "P" to the Declaration of John Tollenaere, submitted herewith), the Area Office states that, "scheduling for the pre-award survey was problematic," apparently suggesting that PLI delayed the DCMA teams entry into the Montana facility. The scheduling problems were on the part of the DCMA personnel, and PLI, in fact, attempted to speed up the visit.

Continuing on page 3 of the Memorandum, the Area Office concedes that the DCMA pre-award survey concluded that the Montana facility was "technically capable" of performing the contract if an award were to be made to PLI. The Area Office ignores that and concludes because at the time of the DCMA visit no actual manufacturing of the platforms was being conducted, there is a "risk" that the manufacturing "could be accomplished outside the U.S." Essentially, the Area Office is suggesting that PLI will ignore its representations to the Agency in response to the request that it verify that the platforms will be manufactured domestically (arguably at the risk of an 18 U.S.C. § 1001 false statement violation), its representations to SBA in the Declaration Under Penalty Of Perjury signed by its Mr. Tollenaere, as well as the terms of its (potential) contract.

On page 4, the Memorandum makes much of the statement in the letter by which PLI transmitted its response to the Protest, "We are aware of no requirement that the same specific products are being manufactured," at the time of the offer or certification. The Area Office states that this "implies" that the platforms were not being manufactured in Montana at the time of the certification. There was no implication in PLI's statement; that platforms were not being manufactured in Montana at the time of the offer or the final revision, because there were no open contracts calling for manufacturing in Montana at the time. The Area Office is unreasonably taking PLI's statement that no manufacturing was taking place in Montana in May of 2007 as evidence that no manufacturing could have taken place there. As verified by the DCMA Pre-Award Survey Team, sufficient space, equipment and personnel were either on-site or available at the WCWTI facility in Montana, so that manufacturing could have been done there, had there been a contract in May.

Also on page 4 of the Memorandum, the Area Office makes reference to the West Coast Weld Tech production manual PLI submitted to it (which was a duplicate of the one submitted to the DCMA Preaward Survey Team), showing the Montana business address, and compares it to one, "supplied to us (i.e., the Area Office) from the contracting officer *submitted in the original proposal* showing a logo of West Coast Weld Tech in Langley, B.C. [i.e., Canada]...." (emphasis supplied). However, PLI submitted no such production manual with its original proposal, since it had supplied the platforms previously under its GSA FSS contract. See Exhibits "B" and "D: to the Declaration of John Tollenaere, submitted herewith. Even after the Agency requested more information, PLI never submitted a complete production

manual; the only one PLI submitted was the one given to the DCMA team showing the Montana address, which was a compilation of the quality system, material handling and production processes used by WCWTI.[3]

Later on page 4, the Area Office discusses the list of assets located at the Montana facility as of May 14 (a list supplied in response to the Area Office's specific request). The Area Office gave this document no weight, for while the document states that it is the list as of May 4, it does not state what date it was prepared. Obviously the document was prepared in response to the Area Office's inquiry; since it was not created at or about May 14 (when no request for such a document was pending), the Area Office apparently considered it suspect.

The Area Office determination then continues by comparing machinery in Montana to machinery in Canada, and labor in Montana versus labor in Canada (acknowledging that more labor is being expended in the U.S.). It then concludes that the fact that West Coast Weld Tech has more machinery in Canada than Montana, coupled with the acknowledgement by PLI that no platform manufacturing was taking place in Montana as of May 14, means that the Montana facility is not the manufacturer of platforms to be supplied under a contract arising from the Solicitation.

Regarding, the Area Office's statements regarding the "risk" that PLI "could" manufacture the platforms outside the United States (i.e., in Canada), though PLI has been unable to find an OHA decision on-point, numerous GAO decisions have

---

3 Note: it would appear that the contracting officer sent the Area Office the production manual that had been submitted by Fernandez and on which the OHA largely relied in sustaining an area office determination that the offeror was ineligible for proposing to supply a Canadian manufactured product.

held that absent evidence to the contrary, the Government may assume that the offeror intends to comply with the representations in its offer and the terms of the resultant contract; ensuring that compliance is a matter for contract administration. See, Raloid Corporation, B-297176, November 10, 2005, 2005 CPD ¶ 2005 at page 4 (concerning the FAR's limitations on subcontracting provision, included in Small Business Set-Aside procurements).

Regarding the crux of the Area Office's determination, namely that no manufacturing was taking place in Montana on or before May 14, 2007, PLI would first look to SBA's size standards; specifically, § 121.406, entitled "How does a small business concern qualify to provide manufactured products under small business set-aside or 8(a) contracts?" See 13 CFR § 121.406. Nowhere does the regulation specifically state that the offeror must have been manufacturing the specific products at the time of the offer. Moreover, in (b), non-manufacturers (such as PLI), it states, in pertinent part:

> (iii) Will supply the end item of a small business manufacturer or processor made in the United States. . . .

Looking again, to OHA decisions, PLI has so far found none dealing with the precise situation (a facility not actually manufacturing as of the date of the offer). However, while not precisely on-point PLI would analyze the situation to those involving newly established firms qualifying as "manufacturers" under the then requirements of the Walsh-Healey Public Contract Act, 41 U.S.C. §§ 35-45 (since eliminated by the Federal Acquisition Streamlining Act of 1994). The Walsh-Healey Act required an offer on a government contract to be a regular manufacture or

dealer. Regulations promulgated pursuant to that act required a newly created offeror to show that it:

> (1) Had made written, legally binding arrangements or commitments to enter a manufacturing business. (An offeror should not be barred from receiving the award because it has not yet done any manufacturing, even if the arrangements and commitments are contingent upon the award of a Government contract);
>
> (2) Had not been set up solely to produce on a Government contract and that its operations will not be terminated upon completion of the contract;
>
> (3) Had established arrangements for production on a continuing basis of the particular materials, supplies, or equipment desired by the Government; and
>
> (4) Had documentation to prove that necessary written, legally binding arrangements or commitments have been met before award.

See FAC 90-34, October 30, 1995; FAR 22.606-1(b); 48 CFR § 22.606-1(b).

In *Ulstein Maritime, Ltd. v. United States,* 464 F, Supp. 720 (D.R.I. 1986), aff'd, 833 F.2d 1052 (1st Cir. 1987), the court stated that the key to determining whether an offeror qualifies as a newly entering manufacturing is whether it has prior arrangements and definite commitments to produce a manufactured item. Moreover, the Walsh-Healey Act did not require a bidder to stipulate that it had previously manufactured the item bid upon. All that was necessary was that the bidder stipulate that it would be the manufacturer of that item, *Prevue-Radsell Co.,* B-138114, 39 Comp. Gen. 254 (1959); *Secretary of the Navy,* B-141562, 39 Comp. Gen. 684 (1960). The Comptroller General, in answering a protest in *Prevue-Radsell*, stated on this point (at 257):

> You contend that Circular Letter No. 1-58 is not a valid regulation, since 1(a) of the Walsh-Healey Act. That section of the act requires a bidder to expressly represent "that the contractor is the manufact-

> urer of . . . the materials, supplies, articles, or equipment *to be manufactured* or used in the performance of the contract.' This section does not require a bidder to stipulate that he has previously manufactured the item bid upon, as you contend. It only requires a bidder to stipulate that he will be the manufacturer of the item bid upon.

Finally, the Area Office's statements to the effect that there is more machinery at the WCWT facility in Canada then there is at the WCWT facility in Montana are irrelevant. For one thing, WCWT produces a number of items aside from maintenance platforms. It will, therefore, always have more equipment then the Montana facility, which was established specifically to manufacture maintenance platforms in the U.S. under those contracts which require an item manufactured in the U.S.

As noted above, the Area Office determination erroneously interprets the phase "will supply the end-item of a small business manufacturer . . . made in the United States," to mean "will supply the end item of a small business manufacturer [currently manufacturing or having previously manufactured the end items] . . . in the Unites States." Moreover, the Area Office's statements that there is a "risk" that PLI "could" manufacture the platforms outside the United States amount to mere assertions (entitled to no weight). See, e.g., Size Appeal of Innovative Technology, Inc., SBA No, SIZ-4103 at 4 (1995). Moreover, they are contrary to established precedent regarding an offeror's intent.

## IV. CONCLUSION

WHEREFORE, for all the foregoing reasons, Plaintiff, Precision Lift, Inc. asks the Court to issue a Temporary Restraining Order and Preliminary Injunction, as

requested, enjoining award of the contract arising from the Solicitation, pending a decision on PLI's Size Appeal.

Respectfully submitted,

**MARC LAMER**
Attorney for Plaintiff
Precision Lift, Inc.

Kostos and Lamer, P.C.
1608 Walnut Street, Suite 1300
Philadelphia, PA 19103
(215) 545-0570

Dated: October 31, 2007

**IN THE UNITED STATES COURT**
**OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **Precision Lift, Inc.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No.** |
| **v.** | ) | |
| | ) | |
| **The United States** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DECLARATION OF JOHN TOLLENAERE**

I, John Tollenaere, declare under penalty of perjury that the following is true and correct, to the best of my knowledge, information and belief.

1. I am the President of Precision Lift, Inc. ("PLI") and I am authorized to make this Declaration on PLI's behalf.

2. PLI has been in operation since May of 1990; it was originally incorporated in the State of Virginia, the Virginia Corporation was dissolved and PLI was then incorporated in the State of Montana in 1999

3. Since October, 2005 I have been the sole stockholder in PLI, and through me PLI has been certified by SBA as a Viet Nam Era Service Disabled Veteran-Owned Small Business ("SDVBO"); PLI is also a SBA certified HUBZone Small Business Concern.

4. In 2001 PLI began working with a Canadian company, West Coast Weld Tech, Inc. ("WCWTI"), which was a manufacturer of helicopter maintenance platforms.

5. In 1998, PLI had been awarded a General Service Administration ("GSA") Federal Supply Schedule ("FSS") contract for Heli-Baskets, i.e., Contract No GS-07F-9893H; in 2001, as a result of PLI's new relationship with WCWTI, helicopter maintenance platforms were added to PLI's GSA FSS contract.

6. Because GSA contracts contain a NAFTA clause (FAR 52.225-21 or 52.225-21), the contractor is permitted to supply Canadian manufactured products, as if they were domestic.

7. Subsequently, PLI and WCWTI discussed the establishment of an American manufacturing facility, so as to be able to compete for maintenance platform contracts outside of PLI's FSS contract (i.e., contracts without the NAFTA clause).

8. As a result, in 2005 WCWTI established West Coast Weld Tech International ("WCWT Int'l") at 4101 North Star Blvd., Great Falls Montana.

9. In November of 2006, I became aware of a procurement being conducted by U.S. Army Aviation and Missile Command ("AMCOM"); the procurement, a small business set-aside, contemplated a FIVE (5) YEAR Indefinite Delivery-Indefinite Quality ("IDIQ") contract for maintenance platforms for various helicopters.

10. The FedBizOps announcement established a size standard of 1,000 employees and cautioned that participation in the procurement was limited to "U.S. Small Businesses;" under the NAICS code/size standard (i.e., 1,000 employees), PLI qualifies as a small business.

11. Solicitation W58RGZ-07-R-0266 ("the Solicitation") was then issued by AMCOM on January 25, 2007. A copy of the Solicitation is attached hereto as Exhibit "A."

12. The Solicitation included the clause at FAR 52.219-6, Notice of Total Small Business Set-Aside; that clause requires that if the offeror is not the manufacturer of the items being purchased by the Government, the offeror agrees to supply only items produced by a small business located in the U.S.

13. PLI submitted its offer in response to the Solicitation by letter dated February 28, 2007. A copy of PLI's proposal is attached hereto, incorporated herein and marked Exhibit "B."

14. By letter dated March 15, 2007 the AMCOM contracting officer advised PLI that its proposal had been found to be "technically unacceptable" for various reasons. A copy of the March 15, AMCOM letter is attached hereto, incorporated herein and marked Exhibit "C."

15. By letter dated March 23, 2007, I responded to AMCOM's March 15 letter, providing the requested information. A copy of the March 23, 2007 PLI letter is attached hereto, incorporated herein and marked Exhibit "D."

16. My letter responded to a question in AMCOM's letter and indicated PLI intended to subcontract the manufacture of the platforms to "West Coast Weld Tech;" I did not differentiate between West Coast Weld Tech, Inc. and West Coast Weld Tech International, Inc., but my intent was for the manufacturing operation to be conducted at the WCWCT Int'l facility in Montana.

17. This intent was confirmed in my letter of April 19, 2007 to WCWTI in response to the April 18, 2007 WCWTI Annual Report; I expressed PLI's understanding that any maintenance platforms manufactured by WCWTI for PLI would be manufactured in Montana. A copy of the April 19 letter is attached hereto, incorporated herein and marked Exhibit "E."

18. By letter dated May 1, 2007, AMCOM informed PLI that its proposal was now considered "technically acceptable;" PLI was also asked to confirm that its platforms would be manufactured in the United States, since according to the AMCOM letter PLI "is teaming with West Coast Weld (sic) which is a Canadian Company." A copy of the AMCOM letter is attached hereto, incorporated herein and marked Exhibit "F."

19. By letter dated May 4, 2007, PLI responded to AMCOM's May 1 letter and verified that all end-products it would supply under a contract arising from the Solicitation would be "manufactured domestically." A copy of the May 4 letter is attached hereto, incorporated herein and marked Exhibit "G."

20. At PLI's request, WCWTI later confirmed that all manufacturing operations would be performed at its WCWT Int'l facility in Montana; it also provided a report on the status of the Montana facility to perform the necessary manufacturing operations. Copies of WCWTI's July 1 and July 7 letters are attached hereto, incorporated herein and marked Exhibit "H."

21. In late July/early August, a DCMA Team visited the WCWT Int'l facility to perform a Pre-Award Survey in order to verify that the platforms required under a contract arising from the Solicitation could be manufactured at the WCWT Int'l

facility; as part of that review, PLI provided a three-ring binder of documentation on itself and a WCWTI binder, outlining the company history and its plan for all the manufacturing operations required to produce the maintenance platforms to be conducted in its U.S. facility.

22. PLI has not seen a copy of the Pre-Award Survey, but we understand that the DCMA team verified that the contract, if awarded to PLI, could be performed at the WCWT, Int'l facility in Montana.

23. By letter dated September 11, 2007, PLI was informed by AMCOM that it was ineligible for a contract award due, according to AMCOM, to a decision by SBA concerning WCWTI (i.e., that the platforms would be manufactured in Canada). A copy of the letter is attached hereto, incorporated herein and marked Exhibit "I."

24. PLI had become aware during the Summer of a size challenge against the apparent winner, Fernandez Enterprises, LLC ("Fernandez"); that challenge resulted in a decision by SBA that the Fernandez proposal contemplated manufacturing of the platforms at WCWTI's Canadian facility and thus it was ineligible for award under the 52.219-6 clause; that decision was later affirmed by the SBA office of Hearings and Appeals ("OHA"). A copy of the OHA decision in attached hereto as Exhibit "J."

25. While PLI heard "through the grapevine" that there had been a size challenge against the Fernandez offer, PLI did not receive notice of the challenge from SBA of the challenge and did not participate in the SBA proceedings.

26. In response to AMCOM's September 11 letter, PLI's counsel filed an Agency Protest contending that the issue of whether PLI's proposal was eligible for award was exclusively committed to SBA and that the OHA decision did not rule that the Montana facility was not a manufacturer; rather it ruled that it was not the manufacturer identified in the Fernandez proposal, which clearly showed Fernandez's intent to manufacture the platforms in Canada; the Agency Protest went on to explain that PLI's proposal, as confirmed by the DFAS Pre-Award Survey team, contemplated manufacture of the platforms in Montana and that the platforms could, in fact be manufactured in Montana. A copy of the Agency Protest is attached hereto as Exhibit "K."

27. PLI believes that AMCOM then notified unsuccessful offerors that PLI was the proposed awardee; that apparently prompted a size protest by Spika Welding and Manufacturing, Inc. ("Spika"), another offeror on the Solicitation.

28. Spika's protest, for the most part, parroted the OHA decision; however that decision, as is noted above, is based on a review of the proposal submitted by Fernandez showing that its platforms would be manufactured in Canada. A copy of the Spika Protest is attached hereto as Exhibits "L."

29. PLI responded to the Spika Protest by providing SBA with a Declaration Under Penalty Of Perjury signed by me in which I reiterated PLI's commitment to produce the platform at the Montana facility. A copy of the Declaration (without attachments) is attached hereto as Exhibit "M."

30. On October 18 at about 1:50 P.M., PLI received an e-mail from SBA requesting certain additional information; the e-mail requested the information by close of business that day. A copy of the e-mail is attached hereto as Exhibit "N"

31. PLI responded by October 19, providing the information requested and answering the questions in the previous day's e-mails. A copy of PLI's letter of October 19 is attached hereto as Exhibit "O."

32. On October 24, 2007 the SBA Atlanta Area Office ruled that PLI was ineligible for the award under the Solicitation, because in sum and substance, PLI could not show that manufacturing of platforms was actually taking place at the Montana facility on the date of PLI's Final Offer to AMCOM, and, according to the SBA decision, there was a "risk" that the platforms required under a contract resulting from the Solicitation "could" be manufactured in Canada. A copy of the SBA decision is attached hereto as Exhibit "P."

31. PLI has appealed the Area Office decision to the SBA Office of Hearings and Appeals ("OHA"), challenging the decision by the Atlanta Area Office. A copy of the Appeal letter is attached hereto as Exhibit "Q."

33. The OHA, as I understand it, has a policy that where, as here, the size determination was contract specific (i.e., only applicable to the particular procurement), if the contract is awarded, any Size Appeal will be dismissed as moot, meaning PLI will be denied the opportunity to overturn the SBA Size Determination and receive the contract award.

Signed under penalty of perjury this 30th day of October, 2007 at Seneca, South Carolina.

John Tollenaere